## Case No. 15,528.

### UNITED STATES v. KESSLER.

[Baldw. 15.] [1]

Circuit Court, D. Pennsylvania. Oct. 23, 1829.

PIRACY—ROBBERY ON HIGH SEAS—FOREIGN VESSELS — JURISDICTION OF UNITED STATES COURTS—TESTIMONY OF ACCOMPLICE.

1. The defendant was indicted for robbery and piracy on the high seas, on board a brig called L'Eclair, a foreign vessel, belonging exclusively to French owners, and sailing under the French flag. *Held*, that under the acts of congress of the United States, this court has no jurisdiction to try and punish the offence.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Bernhard v. Creene, Id. 1,349; U. S. v. Lewis, 36 Fed. 450.]

[Cited in People v. Tyler, 7 Mich. 214.]

2. Whether the offence was committed within or without a marine league of the coast of the

---

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

United States, is of no importance to the question of jurisdiction.

[Cited in U. S. v. New Bedford Bridge, Case No. 15.867; Waring v. Clarke, 5 How. (46 U. S.) 481; U. S. v. Seagrist, Case No. 16,-245; The Hungaria, 41 Fed. 111.]

3. Testimony of an accomplice, how to be regarded.

[Cited in U. S. v. Reeves, 38 Fed. 410; U. S. v. Ybanez, 53 Fed. 540.]

[Cited in Com. v. Price, 10 Gray, 475; Com. v. Savory, 10 Cush. 539.]

The indictment [against Henry Kessler] contains four counts: The first charges, in substance, a robbery from the captain of the vessel called L'Eclair; second, stealing the same property from and out of the vessel belonging to certain persons unknown; third, with piratically running away with the vessel and with the goods, &c. belonging to persons unknown. The fourth lays the running away with the vessel and stealing the goods to have been within a marine league of the coast of the United States.

Mr. Dallas, for the United States.

Defendant is charged with a piracy; that is, a felony committed on the high seas. Piracy is of two kinds: (1) General piracy by the law of nations; (2) particular, created by the acts of congress. The defendant does not fall within the first description. He is indicted as a citizen of the United States, for violating the laws of the United States. (1) These laws are co-extensive with the national country of the United States, which extends a marine league from the coast; (2) with the flag of the United States; (3) over the persons of the citizens of the United States, wherever they may be. There are two acts of congress applicable to this case: That of 15th of March, 1820, § 3 (3 Story's Laws, 1798 [3 Stat. 600]); that of 30th of April, 1790, § 8 (1 Story's Laws, 84 [1 Stat. 113]).

Mr. Dallas gave a full account of the facts of the case which will be given in evidence. He proceeded to the examination of the witnesses on the part of the United States. In the course of the examination of John Battiste, who was on board of the vessel, he was about to detail all the circumstances of the transaction, the manner in which the vessel was taken possession of by the crew, and what there was done by them in the prosecution of this design.

Mr. Brewster, for defendant, objects to any evidence in relation to the murders mentioned by the district attorney in opening the case. He said that there are three bills of indictment found against the defendant: (1) For murder, containing three counts; (2) for piracy, with four counts; (3) for a misdemeanour. The murder, if any was committed, constitutes a distinct and substantive charge, for which the defendant must answer on the trial of the indictment for that offence.

Mr. Dallas replies, that he has a right to give in evidence all that took place on board of the vessel.

(THE COURT. One of the charges now on trial is, that the defendant piratically and feloniously ran away with the vessel. To prove this the acts which accompanied it may be given in evidence; it must be shown, not only that he did run away with the brig, but that he did it piratically and feloniously; and this can be shown only by the circumstances attending the transaction. How did he run away with the vessel? For what purpose? How did he get possession of her? How take her from those who had the lawful possession of her? Was it by violence, or otherwise? with the consent, or against it, of the master? The manner of their taking possession is of the very essence of the charge. Suppose the crew had assaulted and confined the captain, and then taken the vessel, could it be argued that this was a distinct offence in itself, and therefore could not be given in evidence?) ·

The evidence was admitted. Before the termination of the examination of this witness, the court adjourned. The district attorney and the counsel for the prisoner, agreed that the jury might separate; the court gave no order or opinion on the subject, but left it entirely between the counsel.

The testimony given by several witnesses, on the part of the prosecution, being closed, Mr. Brewster, for defendant, said that he had no evidence to offer. He stated his ground of defence: (1) That the evidence has not made out a case of general piracy, but that the defendant, if guilty of any thing, is guilty of a piracy, made so by the acts of congress. (2) That the power to define and punish piracy, given to congress by the constitution, does not extend to any vessel under any flag but that of the United States, although the offender be a citizen of the United States; that this being a French vessel, and the defendant a mariner on board of her, he had, for the time being expatriated himself, and if guilty of any offence, can be punished only by the laws of France; that there is no evidence that the defendant is a citizen of the United States; that the vessel was not scuttled, nor the robbery committed within a marine league of the coast of the United States, and if they were, yet the acts of congress do not make such acts piracy; that the indictment is imperfect and insufficient; there is no averment that the vessel was American; it is necessary to aver that the defendant is an American citizen, and that the owners were Americans.

Mr. Dallas, for the prosecution.

As to the marine league, the original act being done on the high seas, common to all nations, cannot divest the owners of their property, or give security for the perpetrators of the crime. The ownership remained when the vessel was brought within the jurisdiction of the United States; they were di-

vested of their property by scuttling the vessel, and not until then; and this was done within the marine league. Like the case of stealing in one county and taking the goods into another; every detention is a fresh taking. The act of congress on which this indictment was framed, was passed 15th of May, 1820, § 3 [3 Stat. 600], subsequent to the decisions of the supreme court, and was meant to embrace the cases before omitted as offered by those decisions. This law has a more comprehensive phraseology than the law of 1790; "any person in and upon any ship or vessel;" that part of the indictment which relates to running away with the vessel is founded on the act of 1790. If the fact can be established that the crime was committed within a marine league of our coast, there can be no doubt of the jurisdiction; this is within the territorial limits of the United States. Vatt. Law Nat. bk. 1, c. 21, p. 204, §§ 288, 295; Id. bk. 2, c. 7, § 84; 1 Azuni, Mar. Law, 204; Church v. Hubbart, 2 Cranch [6 U. S.] 234; The Ann [Case No. 397]; 3 Story's Laws, 1798 [3 Stat. 600]; Act 1820; Palmer's Case, 3 Wheat. [16 U. S.] 630. I agree that the general words of the law of 1820 must have some limitation and restriction, to places and persons over which the legislative power of the United States extends. Foreign territory and foreign vessels, as an extension of that territory, are beyond our legislation, but American citizens are subject to it wherever they are. Vatt. Law Nat. bk. 2, c. 8, §§ 107, 108, 111. It is true that this reasoning may make the defendant amenable to another jurisdiction, but cannot throw off this. [U. S. v. Palmer] 3 Wheat. [16 U. S.] 610, 630, 641; [U. S. v. Klintock] 5 Wheat. [18 U. S.] 144, 147, 152; [U. S. v. Pirates] 5 Wheat. [18 U. S.] 184, 192, 195; U. S. v. Furlong, Id. 197, 198; U. S. v. Holmes, Id. 412.

Mr. Brewster, for defendant.

There are four counts in the indictment; in some of them defendant is not stated to be a citizen of the United States. The charge is for piracy, not robbery or murder. Piracy is not a common law offence, or punishable by the courts of common law. 7 Dane, Abr. 88, art. 6, § 2; 1 Browne, Civ. and Adm. Law, 461; Vatt. Law Nat. bk. 1, c. 23, § 280; 4 Bl. Comm. 71, 73; Act March, 1819; 3 Story's Laws, 1739 [3 Stat. 510]. The piracy is charged under the acts of congress. It is admitted that the vessel was altogether French, sailing under the French flag. As to the marine league. If the vessel was French, the offender was out of the jurisdiction of the United States, as much as if the crime had been committed at Bourdeaux; but the vessel was not within fifteen miles of the shore until dark; at dark they took their course for the light-house. As to bringing the property within the United States; it is not like the case of taking it from one county to another; the principle does not apply to the case of carrying the stolen goods from one state to another. The vessel was a distant floating colony of France. 1 Story's Laws, 86; Act April, 1790, § 16 [1 Stat. 116]. Thus if the act was done within the United States, it should be punished as a larceny, as within the body of a county, not as a piracy on the high seas. As to state rights, 6 Dane. Abr. 359, § 18. As to the admiralty jurisdiction, Id. 356, art. 11, §§ 13–16. The United States have a jurisdiction within the limits of any state or over offences committed within the body of any county of a state, only on the subjects specially mentioned in the constitution. The acts of congress contemplate no piracy unless it is committed on the high seas, or on board of some public vessel, or a vessel owned by citizens of the United States. The words "any person" and "any vessel" are used in every section of the act of 1790,— section 2, treason; section 18, perjury; section 20, bribery. Palmer's Case, 3 Wheat. [16 U. S.] 610; U. S. v. Howard [Case No. 15,404]; 7 Dane, Abr. 93, § 11, 92, 9; Vatt. Law Nat. bk. 1, c. 23, §§ 281, 289; Id. bk. 2. c.8. Defendant by enrolling himself as one of the crew of the vessel submitted himself to the laws of France regulating its commerce. The act of 1825 was intended to meet the decision in Wiltberger's Case [5 Wheat. (18 U. S.) 76]. If congress had intended to change the law as given in Palmer's Case by the supreme court, they would have been equally clear and explicit in doing it. The Pirates, 5 Wheat. [18 U. S.] 186, 195. Judge Johnson says, that Palmer's Case covers the case of an American as well as a foreigner on board a foreign vessel. Holmes's Case, 5 Wheat. [18 U. S.] 416. As to citizenship of defendant, 1 Caines, 59; Coxe. Dig. 432, § 224. If defendant has committed any offence it is against the law of France. Such cannot be punished here. Chief Justice Tilghman so decided in the case of a murder committed in Ireland. As to the facts, the evidence is insufficient for a connected conviction. U. S. v. Ross [Case No. 16,196]; U. S. v. Vogle, 2 Dall. [2 U. S.] 347; Phil. Ev. 79.

Mr. Dallas replied: The acts of April, 1790, of March, 1819, and May, 1820, were passed to meet the decision in Howard's Case [supra], which, for the first time, denied the jurisdiction of the courts of the United States of a general piracy. There are no words in the act of 1820 to restrict the construction as in the act of 1790. Why enact the law of 1820, if it is the same with that of 1790? There has been no decision on the law of 1820; it is now to be decided for the first time. Replies to Mr. Brewster's observation on the facts and evidence of the case.

The court adjourned.

HOPKINSON, District Judge (charging jury). It is a matter of much anxiety and regret to me, and I doubt not to you. that we are deprived of the aid of the learning and experience of the presiding judge of this court,

in the trial of this cause; and if any arrangement could have been made by which the numerous and important questions of law that have been agitated, could have been reserved for his opinion, and, if necessary, carried to the supreme court, it would have been very agreeable to me. But the same law which authorizes a single judge to hold this court, makes it his duty to do so whenever required. The defendant has put himself on his trial before us, and he has a right to your judgment and mine on his whole case. Our course is a plain one. We must render that judgment honestly and fearlessly, according to our own consciences and true opinion; and, doing this, we shall be acquitted of any wrong, even if we fall into error, and stand justified to ourselves and our country.

In the indictment now submitted to you, Henry Kessler, the prisoner at the bar, stands charged with four distinct offences; and your verdict, governed by the evidence and law of the case, will decide whether he is guilty or innocent of all or any of them. It is put beyond all doubt that a fearful crime has been committed, which, indeed, has seldom been exceeded in deep malignity and reckless cruelty. It is our duty, nevertheless, to inquire, with a deliberate and just impartiality, whether the defendant was an actor in the bloody scene, what part he took in it, and whether we have a warrant and authority to bring him to an account for it. The first inquiry will be determined by the evidence you have heard; and the second, by the law of the land, to which we all owe an implicit obedience.

The indictment contains four counts: The first, in substance, charges that the prisoner, upon the high seas, with certain persons unknown, on board of a brig or vessel called L'Eclair, made an assault upon the master of the said brig, put him in fear, and robbed him of certain goods and moneys belonging to him. The second count charges the robbery to have been of the goods, effects, and moneys of persons unknown, and committed within a marine league of the coast of the United States. The third charges the prisoner with piratically and feloniously running away with the said brig, and with certain goods, moneys, and effects belonging to persons unknown. The fourth and last count charges the running away with the vessel and the stealing of the goods to have been done within a marine league of the coast of the United States.

It appears that in November last (1828), the brig L'Eclair was in the port of Philadelphia, when the defendant, with five other persons, shipped on board of her as mariners. There were besides on board, the captain, a mate, and a young Frenchman. The vessel sailed from Philadelphia for Goree, in Africa, where she arrived, and remained about a month. She sailed from Goree to Cayenne, and arrived safely there; and remained there about six weeks. At this place the mate, who

sailed with her from Philadelphia left her and another was taken in his place: but all the other persons who went out in her, were on board when she sailed from Cayenne. For the occurrences that happened after the vessel left Cayenne, including the horrible transactions which have brought the prisoner to the bar, we are compelled to rely on the testimony of John Battiste who was cook and steward of the brig, and is the only witness produced to give an account of them.

Before I call your attention to the circumstances and facts testified by this witness, it will be well to explain to you the rules of law by which his credibility may be tested. John Battiste was on board the brig when the enormities were committed; he received, by fear and compulsion, as he says, a part of the plunder; he made no discovery of the crime on his arrival in the United States, but appropriated the money he had received to his own use, telling a falsehood as to the manner in which he had obtained it; and disclosing what he now has sworn to be the truth, only on being arrested and charged with the crime. Still we are hardly authorized to say he is an accomplice; he has made no such confession, nor is he charged as such in the bill before us. If, however, his evidence is to be considered as that of an accomplice, which is putting it in its worst light, it does not follow that it is to be disbelieved. The law, founded not only on good policy but on good sense also, admits such evidence to be competent, and then endeavours by certain wholesome and reasonable restrictions to guard the innocent from injury from witnesses in such suspicious circumstances. It is certainly true that when a witness is admitted to be competent, his credibility rests entirely with the jury, who may therefore convict upon the testimony of an accomplice, though unsupported by any other proof, and if they conscientiously believe him, it is their duty to do so. This, however is seldom the case; and it is usual for the court to advise a jury not to regard the evidence of an accomplice unless he is confirmed in some parts of his evidence by unimpeachable testimony. But you are not to understand by this that he is to be believed only in such parts as are thus confirmed, which would be, virtually, to exclude him, inasmuch as the confirmatory evidence proves of itself those parts it applies to. If he is confirmed in material parts, he may be credited in others; and the jury will decide how far they will believe a witness, from the confirmation he receives by other evidence; from the nature, probability and consistency of his story; from his manner of delivering it, and the ordinary circumstances which impress the mind with its truth.

The credit which shall be given to the evidence of John Battiste, is unquestionably of primary importance in the decision of this cause. It is from him only we have the details of the awful crimes which sacrificed three unoffending victims to avarice and cru-

elty, and of the part taken by the several actors in this bloody tragedy. He avers his ignorance of this conspiracy, he denies any participation in it, and pretends that his acquiescence was owing to menaces and fear of his own life. On the other hand, we find him receiving, reluctantly, he says, his share of the plunder: coming off from the vessel in apparent good fellowship with the murderers and robbers. He comes with them all to Brooklyn, a considerable town, opposite to New York; he goes into that city with the present prisoner; he comes on to Philadelphia, and proceeds to Cape May, the place of his residence, never giving the slightest hint of the crimes he had seen committed, nor taking a step to have the offenders brought to justice. On the contrary, he sits himself down quietly to enjoy his portion of the plunder; he buys land, and makes other purchases with the money, and in short appropriated it to his own use, as if it were honestly his own. In addition to this, he told a falsehood to those who inquired how he obtained so much wealth, saying he got it from his sister in the West Indies. All this weighs heavily upon him; and for the part he really took in the murder and robbery, if he took more than he has avowed, he must answer not only to the justice of this country, but to a more awful tribunal hereafter. Notwithstanding all this, he may have told the truth to you, and under circumstances and with corroborations which will entitle him to belief. At most, the circumstances I have alluded to against him, only prove him to have been a full accomplice in the crime; but it is often only from such witnesses, and sometimes the worst, that great crimes are discovered and punished. How, then, is this witness corroborated by other unimpeachable evidence? His account of the men on board; the manner and place of their shipping; of the voyage, cargo, and other facts less important, all appear to be strictly correct. He is further confirmed by an overwhelming fact in this business. This brig sailed from Cayenne in March last; and from that time we have heard nothing of her except from John Battiste. Had she perished at sea, with all her crew, we should not see Battiste and Kessler here. If the vessel was lost and the men saved, it would have been easy for the defendant to have given some proof of the fact. But none has been attempted. The vessel is gone, and the men are here. Again; a pair of pantaloons, sworn to belong to the captain, not only by Battiste, but by two most respectable witnesses, are traced to the possession of the defendant; and he was bold and callous enough to wear them as his own. Add to these the money he had, in considerable quantities, consisting of peculiar foreign coins, the same as those plundered from the vessel; and last of all, his admission that he helped to throw the captain overboard, and that in this Battiste had told the truth. Assuredly these are corrobo-

rations of a strong character of the evidence of John Battiste; and the more so, as the prisoner has not attempted, by a particle of evidence, to repel or explain any of these circumstances, nor to contradict any part of Battiste's evidence.

With these remarks, the evidence of J. Battiste is left to the jury; and they will judge of it as it has or has not produced belief on their minds. You are to be reasonably satisfied of its truth, before you will found your verdict upon it; and you will make up your opinion on all you have seen and heard in the course of this trial. If, then, you shall believe that the prisoner took the part attributed to him in the transactions of the 4th March, 1829,—a day, he said, he should never forget,—it cannot be questioned that he is a principal in the crime, although he did not strike any of the mortal blows; he was present, aiding and abetting the actual murderers; and you may presume, from the manner in which he rendered his assistance, and his whole deportment at the time of the murder and subsequent to it, that he was a party to the whole conspiracy and design. If, indeed, he acted under terrifying menaces, and a real and well grounded fear of his life had he refused, he will stand excused, but his peril should be violent and clearly proved.

The matter of fact being left entirely to you upon the whole evidence, some important and highly interesting questions of law have been argued in this case, on which it was the duty of the court to give an explicit opinion. It is alleged on the part of the defendant, that there is no proof that he is a citizen of the United States, and that it is in full proof that the brig on board of which the crimes charged in the indictment were committed, was a foreign vessel; that she was wholly owned by French subjects, and was at the time sailing under the French flag. It is then said, that the case presented to you is one in which a foreigner has committed an offence on board of a foreign vessel, and that such a case is not cognizable by the courts of the United States—and so is the law. This argument or inference is founded on the assumption of two facts, which must be settled by you before you receive the conclusion: First, is Henry Kessler a citizen of the United States? This you will decide by the evidence. It appears to me to be hardly susceptible of a doubt. You have had an account of his father residing in New Jersey, since he (the father) was seven years old; of his grandfather living there; of his father and grandmother still living there; of an aunt residing in this city; and no intimation that they had ever been out of this country. Not one of these persons has he produced upon the subject of his birth and citizenship. Such circumstances at least throw the burthen of proof upon him, or leave him to the conclusion every one will drawn from them. The next question of fact is, was the brig

L'Eclair a foreign vessel, belonging exclusively to French owners and sailing under the French flag? You will remember the evidence on this point; it was clear and uncontradicted in proving that she was altogether owned by French subjects, and sailed under the flag of France; and indeed this fact is conceded by the district attorney. If such shall be your understanding of these two facts, then the case is not that of a foreign subject committing an offence on board of a foreign vessel, but of a citizen of the United States committing an offence on board of a foreign ship. The question of law here presents itself—is this an offence under the acts of congress of the United States, and has this court jurisdiction to try and punish the offence? Happily it is not a new question, but has more than once passed under the solemn consideration of the supreme judicial tribunal of our country. The difficulties and doubts, therefore, in which it may once have been involved, are removed by an authority of the highest respectability in itself, and which this, as a subordinate court, is bound to obey.

The first, and as it has been truly called, the leading adjudication on the interesting question now before us, was made in Palmer's Case, reported in 3 Wheat. [16 U. S.] 610. This case came to the supreme court, certified from the circuit court of Massachusetts, where certain questions occurred upon which the opinions of the judges of the circuit court were opposed. Eleven questions were in this manner brought up to the supreme court, where they were argued with much care, and solemnly decided. The third and fourth questions only are material to our purpose. The third is, whether the crime of robbery committed by persons who are not citizens of the United States, on the high seas, on board of any ship or vessel, belonging exclusively to the subjects of any foreign state or sovereignty, or upon the person of any subject of any foreign state or sovereignty not on board of any ship or vessel belonging to any citizen or citizens of the United States, be a robbery or piracy within the true intent and meaning of the eighth section of the act of congress of the 30th April, 1790, and of which the circuit court of the United States hath cognizance to hear, try, determine and punish the same. It will be perceived that this question embraces that before this court, on the supposition that the defendant is not a citizen of the United States.

The next question equally embraces it, on the supposition that he is a citizen of the United States. It is as follows: whether the crime of robbery committed on the high seas by citizens of the United States on board of any ship or vessel not belonging to the United States, or to any citizens of the United States, in whole or in part, but owned by, and exclusively belonging to, the subjects of a foreign state or sovereignty; or committed on the high seas, on the person of any subject of any foreign state or sovereignty, who is not at the time on board of any ship or vessel belonging in whole or in part to the United States, or to any citizen thereof, be robbery or piracy within the said eighth section of the act of congress aforesaid, and of which the circuit court of the United States hath cognizance to hear, try, determine and punish the same.

Nothing can be more distinct and unequivocal than the terms in which these questions are propounded, and they so clearly describe the case of the defendant, be he a citizen or an alien, that the answer given to them by the court must decide his case, so far as it depends upon the acts of congress referred to. The opinion of the courts on these questions was delivered by the chief justice in his accustomed luminous and exact manner. He says: "The question whether this act extends further than to American citizens, or to persons on board American vessels, or to offences committed against the citizens of the United States, is not without its difficulties." He then remarks upon the universality of the words of the section, which are of unlimited extent: " 'Any person or persons' are broad enough to comprehend every human being." The chief justice then goes into a clear, rational and satisfactory argument to show from various parts of the act the inconveniences and the absurdities that would follow the adoption of the full and literal meaning of the words used; that some limitation must be put to them, and was intended by the legislature. He concludes: "The court is of opinion that the crime of robbery, committed by a person on the high seas, on board of any ship or vessel belonging exclusively to subjects of a foreign state, or persons within a vessel belonging exclusively to subjects of a foreign state, is not a piracy within the true intent and meaning of the act for the punishment of certain crimes against the United States." The certificate of the court conforms to this opinion; and was transmitted to the circuit court of Massachusetts as the settled law of our country. This judgment was rendered on the 14th of March, 1818. In the April following, an indictment came on to be tried in this district, in which it became necessary for Judge Washington to refer to the law of Palmer's Case [supra], and declare what had been settled by it. He says, the question arose whether robbery on the high seas committed on board a foreign vessel amounted to piracy, within the true intent and meaning of the eighth section, and was cognizable by the courts of the United States. He repeats that the general and unqualified expressions of the section would cover such a case, but says: "Upon the whole it was decided that a robbery committed by any person on the high seas, on board of a ship belonging exclusively to a foreign state, or to the subjects thereof, or upon the person of a foreign state, in a vessel belonging exclusively to subjects of a foreign state, is not

piracy within the true intent and meaning of the eighth section of that law." He adds: "Although the offence of robbery is the only one stated in this decision, yet there can be no doubt but that all the other acts of piracy enumerated in the section are included in the same principle." In another part of this opinion the learned judge says of Palmer's Case: "That case decides that the act of piracy must be committed on board of an American vessel." U. S. v. Howard [Case No. 15,404].

Two years afterwards this question came again under the notice of the supreme court, in the case of U. S. v. Klintock, 5 Wheat. [18 U. S.] 144. The indictment charged the defendant, a citizen of the United States, with piracy committed on the high seas, in a vessel belonging to persons unknown. The facts were, that the defendant was a citizen of the United States, and the vessel was owned without the United States. The defendant was found guilty generally: his counsel moved in arrest of judgment on various grounds, one of which was, that the act of 30th of April, 1790, does not extend to an American citizen entering on board of a foreign vessel, committing piracy upon a vessel exclusively owned by foreigners. The opinion given in Palmer's Case was here reviewed, and if any mistake or misconception had occurred in it, it would now have been corrected. The opinion of the court is again delivered by the chief justice, and he intends to explain, more clearly, if possible, the meaning of the court in Palmer's Case. He says the opinion and certificate given in that case, apply exclusively to a robbery or murder committed by a person on board of any ship or vessel belonging exclusively to subjects of a foreign government. To amplify the import of these words. the court say, that to bring the person committing the murder or robbery within them. the vessel on board which he is, or to which he belongs, must be at the time in point of fact, as well as right, the property of the subjects of a foreign state. who must have at the time, in virtue of this property. the control of the vessel: she must at the time be sailing under the flag of a foreign state, whose authority is acknowledged. "This," says the chief justice, "is the case which was decided; we are satisfied that it was properly decided."

At the same session of the supreme court the case of U. S. v. Holmes and others was decided, and the opinion of the court delivered by Judge Washington. [5 Wheat. (18 U. S.) 412.] Various questions are here submitted for the judgment of the court. The Case of Klintock is referred to as the settled law, and the judge says: "It makes no difference whether the offender be a citizen or not. If it be committed on board of a foreign vessel by a citizen of the United States, or on board of a vessel belonging to the United States by a foreigner, the offender is to be considered pro hac vice, and in respect to this subject, as belonging to the nation under whose flag he sails." That is, the national character of the offender is nothing; the jurisdiction is decided by the character of the vessel.

But an act of congress was passed on the 3d of March, 1819, which appears to me to have an important bearing on this question. It will be recollected that the decision in Palmer's Case took place in March, 1819. After which, and the decision in Howard's Case, which occurred in the April following, and in these points is substantially the same with Palmer's, the courts of the United States had cognizance of piracies, only (1) when committed on board of American vessels; (2) when committed by persons on board of a vessel not belonging to any foreign power, but in the possession of men acknowledging obedience to no government or flag whatsoever; but our courts had not cognizance of piracies as "defined by the law of nations," which is robbery committed on the high seas; forcibly and feloniously seizing, taking and stealing a vessel from her master, with the goods on board; and other acts of the same description, without any regard to the national character of the vessel. To supply this defect in the law of 1790, or rather to try whether it was a defect or not, the fifth section of the act of March, 1819, was enacted.

When congress passed this act, it must be presumed, and was doubtless the fact, they had the opinion of the supreme court in their view, by which the offence of piracy had been restricted as we have seen. By the fifth section of this act of March 1819, it is enacted: "That if any person or persons whatsoever, shall, on the high seas, commit the crime of piracy, as defined by the laws of nations, and such offender or offenders shall, afterwards be brought into, or found within the United States, such offender or offenders shall, upon conviction thereof, before the circuit court of the United States, for the district into which he or they may be brought, or in which he or they shall be found, be punished with death."

Here then was an act enlarging the jurisdiction of the courts of the United States in the punishment of piracies greatly beyond the limits assigned to it by the supreme court, in their construction of the act of April, 1790; and if the fifth section of the act of 1819 were now in force, it cannot be doubted it would cover the offence charged upon the present defendant. for assuredly the crimes committed on board the brig L'Eclair, amounted to piracy under the laws of nations. Congress, however, had felt the force of the reasoning of the court in Palmer's Case; and may have doubted the policy or propriety of extending their penal law beyond their own vessels, leaving it to other nations to do the same with theirs; and therefore declared, that this act should be in force only until the end of the next session of

congress; and what did they do after making this experiment for one year? They continued, by the act of 15th May, 1820, all the sections of the act of 1819 for another term, except this fifth section which was suffered to expire; and the third section of the act of May, 1820, was enacted, under which some of the counts of this indictment have been drawn and presented. In this third section it will be found that congress have gone back, in their description of piracy, to the use of the general expressions, "if any person" shall commit the crime of robbery in or upon "any ship or vessel," employed in the eighth section of the law of April, 1790; well knowing the limited construction the court had put on these words, not only in Palmer's Case, but in Klintock's and Holmes's, both of which were decided before the law of May, 1820, and during the session of congress at which it was passed; and they abandoned the attempt to give their courts jurisdiction of piracies "as defined by the laws of nations." Further to this point: In March, 1825, congress again legislated on the subject of offences committed on board of vessels, without an attempt to correct the error, if it were one, of the supreme court, or to extend the jurisdiction of the court in such cases beyond the limits assigned to them by the supreme court. Indeed they rather recognise the principle, that the character of the vessel, and not of the offender, shall decide the question of jurisdiction.

In the fifth section it is enacted, "that if any offence shall be committed on board of any ship or vessel belonging to any citizen or citizens of the United States, while lying in a port or place within the jurisdiction of any foreign state or sovereign, by any person belonging to the company of the said ship." the offence shall be cognisable and punishable by the circuit court of the United States. We see here that neither the national character of the offender, nor the territorial jurisdiction of the place where the offence is committed, is regarded, but solely the national character of the vessel to which the offender belongs, and on board of which the offence is committed. It is also worthy of notice that two of the sections of this act, the fourth and fifth, are introduced to meet two defects in the existing law which had been detected by judicial examination. If then the supreme court, by the principle they have adopted, have subjected us to danger and opprobrium, by making our country a refuge for abandoned criminals, it cannot be denied that the congress of the United States must participate in this reproach, for not correcting the law, when they have the power to do it; or rather for giving those principles an acquiescence, if not a direct approval.

It has been argued by the district attorney, that if the law of 1820 is the same with that of 1790, why enact it at all? Why not leave the subject to the provisions already in full force? It is an obvious defect in this argument that it takes broader premises than belong to our question. These laws may be the same in the particulars material to the point we are to decide, that is, the true signification of certain forms of expression, but may differ in other matters. We now only speak of the eighth section of the first act, and the third section of the last, which relate to piracy, for in other respects the laws embrace wholly different subjects of criminal legislation. These two sections do not differ in the phrases on which the construction of the supreme court was passed; and it would introduce a strange and intolerable confusion and incongruity in the administration of justice, if the same words were admitted to have one meaning in the first act, and another in the second, both legislating on the same subject. If a man indicted for piracy under the law of 1790, could not be convicted if the offence were committed on board of a foreign vessel, he might be convicted and capitally punished for the same act, committed in the same circumstances, if indicted under the law of 1820. Nay, what would be done when, as in the present case, some of the counts are founded on one of these acts, and some on the other? It may be remarked, that in the last act the reference to offences punished with death, if committed in the body of a country is omitted; and other differences will be found between the two sections. What effect these differences will have upon the law of 1790, on the points in which they occur, we need not now inquire. On this question of construction of the general words in the law of 1790, it is not amiss to remark, that it is distinctly admitted that if in this case all was foreign, the offender as well as the flag, the prosecution would fall. But the words of the act, in their full and literal meaning, as a common reader would understand them, would certainly embrace such a case; so that the only difference between the supreme court and the district attorney is, that they draw their limits rather closer than he is now willing to do. They differ in the measure, not in the principle; both find it necessary to narrow the broad import of the terms of the act, but they would do so in different degrees and by a different scale.

To pursue the intention and meaning of the third section of the law of 1820 a little closer, let us bring its operative descriptive words, and those used in the eighth section of the act of 1790 together, and on a comparison see whether we can be allowed to say that by one of them it was intended to describe an offence committed only on board of an American vessel, and by the other to describe an offence committed on board of any vessel, American or foreign. By the act of 1790, if any person commit upon the high seas, &c. murder or robbery, or if any captain or mariner of any ship or vessel shall

piratically run away with such vessel, or any goods, &c., every such offender shall be deemed and adjudged a pirate. By the act of 1820, if any person shall upon the high seas commit the crime of robbery in or upon any ship or vessel, or the lading thereof, such person shall be adjudged a pirate. The description in the first act is rather more general than in the second, using the words of the definition of piracy by the laws of nations, that is, robbing on the high seas, referring to no vessel of any description. The supreme court had decided that congress had a right to define piracy, as they had done in the law of 1819, by a reference to the laws of nations, that is "as defined by the laws of nations." We cannot therefore presume that they dropped this definition in 1820, from a doubt of its propriety, and that they intended to cover exactly the same ground by the terms "shall commit the crime of robbery on the high seas," especially as the same court had solemnly adjudged that these terms were not so comprehensive. If they had so intended, they would have said so explicitly, knowing that the court had decided that such expressions would not reach a robbery committed by a citizen or foreigner on board of a foreign vessel, although such would be piracy by the laws of nations, and was included in the definition adopted in the act of 1819. Had it been the intention of the legislature to retain in the act of 1820, as they have done, the words descriptive of the offences which they had used in 1790, but to repudiate the restricted construction put upon them, it would have been easily done by adding to the words "ship or vessel" whether belonging to an American citizen or not.

We cannot overlook that the act of 1790 makes the commission of murder or robbery on the high seas, piracy, punishable by that act. The law of 1820 speaks of robbery only, omitting murder. It follows, that if the description of the offence in the latter act is to have the larger construction contended for, while the former remains subject to the restriction imposed upon it, our courts will have cognizance to try and punish a robbery committed by an American citizen on board of a foreign ship, but not a murder. Can any reason be assigned why congress should make this distinction? We may readily imagine good cause, founded not only on national policy but on strict justice, why congress should finally determine to leave the law as the supreme court had pronounced it; and to decline the trial and punishment of crimes committed in a foreign vessel, that is, within and under a foreign jurisdiction. If we adopt the broad construction of the law of 1820 which its terms import, we must try and punish not only an American citizen, but a foreigner also, for offences committed on sea in a foreign vessel. It is easy to see that this might get us into difficulties with other nations, who may

not choose that we should hang their subjects by the mode of trial and sentence of our tribunals, for offences on board their own ships under their authority and protection. They may choose to be themselves the judges of the guilt of the accused, and of the measure of the punishment. On the other hand, how might our proceeding affect our own citizens? Take the case before you: suppose this defendant, after a full and fair trial, should convince this jury of his entire innocence and be by them acquitted. He would, on a fundamental principle of our criminal law, think himself out of jeopardy and absolved from all further responsibility on this account. Under this belief he goes to France, with or without his means of defence; he is there arrested and brought to trial. Would the courts of that country pay any regard to your judgment in relation to a crime committed in one of their vessels on the person and property of their subjects, and more especially if the offender also was one of their subjects? Questions and difficulties of this sort are avoided by confining our cognizance of offences on the high seas to our own ships, leaving other nations to take care of their own.

On this part of the case it is my opinion that those counts of this indictment which are founded on the act of the 30th of April, 1790, fall directly under the decisions of the supreme court giving a construction to that act; and therefore, if you shall believe, as is indeed conceded by the district attorney, that the offences charged in these counts were committed on board of a vessel belonging exclusively to subjects of a foreign state, sailing under the flag of a foreign state, whose authority is acknowledged, it is not piracy within the true intent and meaning of that act, and this court hath no cognizance to hear, try, determine and punish the same. As to the counts which are founded on the act of May, 1820, it is my opinion that the general descriptive terms of the offence used in this act, must be taken and understood with the same limitations given by the supreme court to the same or similar expressions in the act of April, 1790; and therefore, that if the offences charged in these counts were committed on board of a vessel belonging exclusively to subjects of a foreign state, whose authority is acknowledged, it is not piracy within the true intent and meaning of the act of May, 1820, and this court hath no cognizance to hear, try, determine and punish the same.

The district attorney has made another effort to get this case within the jurisdiction of the courts of the United States; and we must agree that any effort to bring such atrocities to punishment is commendable. The second count of the indictment lays the piratical and felonious stealing of the goods, moneys, &c. from and out of the brig L'Eclair, to have been done within a marine league of the coast of the United States; and

the fourth charges that the defendant, with other persons, within a marine league of the coast of the United States, piratically did run away with the said brig, and with certain goods, moneys and effects, &c. The first step to warrant a conviction on these counts is to establish the facts asserted in them, that is, that the offences charged were actually committed within a marine league of the coast of the United States; and this it is incumbent upon the prosecution to show. The point of time taken by the district attorney is that when the brig was scuttled and abandoned by the crew, taking with them their plunder. Was she at that period within a marine league of our coast? The only witness who testifies upon this subject is John Battiste, who said, on his first examination that it was about three miles from the shore, or it might be more. He afterwards said it was about three miles, which may mean more or less; and finally declared he knew nothing about it from his own observation or knowledge, but spoke only from having heard John Mansfield say, they were about three miles from the shore. What light is given to this part of the case, by the accounts, detailed in a very confused way to my mind, of the direction in which the brig sailed off and on along the coast for several hours before she was left, you may be able to discover. It appears to me to be altogether imperfect and unsatisfactory. But admitting that the brig was within the marine league of our coast, when she was scuttled, does that maintain the charge, to wit, that the moneys and effects were piratically stolen; or that the moneys and effects were piratically run away with. It does not appear so to the court. The goods were stolen when they were taken into the possession of the robbers, and divided between them on the 4th of March, more than a month before they came on our coast. The vessel was run away with at the same time, when she was taken out of the possession of her lawful officers, and her course changed from that she was pursuing. All this was fully accomplished long before she approached our coast. The crime was complete, and nothing was done to add to it, after the arrival at the American shore. I cannot agree to the argument of the district attorney, that jurisdiction is given by bringing the stolen property within the territorial limits of the United States. This is the law as between two counties of the same state, but has been held not prevail in the case of stolen property brought from one of the United States to another.

It is my duty to go on one step further on this subject; you will remark that this point becomes important to the prosecution only on account of the foreign ownership of this brig. Had she been American, then the crime being committed on the high seas it would have been immaterial whether it was within or without the marine league of the coast, either of this or any other country; but it is argued, that although we may not have jurisdiction of an offence committed on the high seas on board of a foreign vessel at a greater distance than three miles from the shore, yet if it be within that distance we obtain a right to try and punish it. I am not of this opinion. The jurisdiction of this court is derived wholly from the acts of congress on this subject. The description of the place to which or over which it extends is the high seas. If then the space within the marine league is not comprehended within this description, this court has no jurisdiction over it; if it be comprehended, as it certainly is, then it is so because it is a part of the high seas, in all respects, and to all purposes the same as any other part of the high seas. Nothing is added to the jurisdiction of the courts of the United States by reason of the offence having been committed within this distance of their coast; nothing is taken from it by reason of its having been committed within the jurisdictional limits of a foreign government, within a marine league of the shore, if done on the high seas, which are held to be any waters on the sea coast, without the boundaries of low water mark. It follows from these principles that if this court has no power under the act of congress to try and punish this offence committed on board of a foreign vessel on the ocean, it acquires no such power because she was within a marine league of our coast when the offence was committed. The principle on which nations claim this extension of their authority and jurisdictional rights for a certain distance beyond their shores, is to protect their safety, peace and honour from invasion, disturbance and insult. They will not have their strand made a theatre of violence and bloodshed by contending belligerents. Some distance must be assumed. It varies by different jurists from one league to thirty; and again, as far as a cannon will carry a ball. Such limits may be well enough for their object, but would be extraordinary boundaries of the judicial power and jurisdiction of a court of law.

It is my opinion that whether this offence was committed within or without a marine league from the coast of the United States is of no importance to the question of the jurisdiction of this court to hear and determine it. The case, gentlemen, is now left with you to be decided according to your judgment and conscience on the fact and the law. I have given you distinctly, I hope, my opinion of the law of the case, and such observations upon the most prominent facts as I have supposed may be of some service to you in your deliberations on them.

On Saturday morning the jury returned a verdict of "Acquitted for want of jurisdiction."